Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2016 09:05 AM CDT

PATRICIA SULU, APPELLANT, V.
KIM MAGANA, APPELLEE.
___ N.W.2d ___

Filed April 1, 2016.    No. S-15-128.

1. **Judgments: Jurisdiction.** A jurisdictional question that does not involve a factual dispute is a question of law.

2. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

4. **Attorney Fees: Costs.** Attorney fees, where recoverable, are generally treated as an element of court costs.

5. **Judgments: Costs.** An award of costs in a judgment is considered a part of the judgment.

6. **Pretrial Procedure: Depositions: Attorney Fees.** The rules governing discovery from a nonparty without a deposition authorize a sanction, including reasonable attorney fees, if undue burden or expense is imposed on the nonparty subject to a subpoena.

7. **Summary Judgment.** A motion for summary judgment shall be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

8. ____. When reasonable minds can differ as to whether an inference can be drawn, summary judgment should not be granted.

9. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and

gives that party the benefit of all reasonable inferences deducible from the evidence.

10. **Torts: Intent: Proof.** To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

11. **Torts: Employer and Employee.** Factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

12. **Torts: Liability.** A person does not incur liability for interfering with a business relationship by giving truthful information to another.

13. **Summary Judgment: Proof.** A party moving for summary judgment makes a prima facie case for summary judgment by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial.

14. ____: ____. Once the moving party makes a prima facie case, the burden shifts to the party opposing the motion to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

15. **Summary Judgment: Evidence.** Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork.

16. **Summary Judgment: Witnesses: Testimony.** In summary judgment proceedings, a witness' testimony may be used if it is based on personal knowledge, sets forth facts that would be admissible in evidence, and is made by a person competent to testify on the matter in issue.

17. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

18. **Rules of Evidence: Hearsay.** The general rule is that hearsay evidence is inadmissible unless it fits within a recognized exception to the rule against hearsay.

Appeal from the District Court for Scotts Bluff County: Leo Dobrovolny, Judge. Affirmed.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Snyder, Chaloupka, Longoria & Kishiyama, P.C., L.L.O., for appellant.

John M. Guthery and Joshua J. Schauer, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, and Stacy, JJ.

Cassel, J.

## INTRODUCTION

On the advice of a parent, who was also a school board member, a student authored a letter critical of a public school teacher's curriculum. Instead of changing her curriculum, the teacher quit her job. The teacher then sued the parent/board member on the theory of tortious interference with a business relationship or expectancy. The teacher appeals from a summary judgment dismissing her claim. Because the parent/board member provided truthful information and honest advice, her actions were not unjustified. We affirm the entry of summary judgment.

## BACKGROUND

### Key Individuals

At all relevant times, Kim Magana was a parent of a student in the Scottsbluff Public School District (School District) and a member of the School District's school board (Board). She ran for a position on the Board out of a desire to make the school's curriculum more rigorous and became a member in 2000. Magana served on the Board's curriculum and technology committee.

Patricia Sulu was an upper-level Spanish teacher and chair of the world languages department at Scottsbluff Senior High School. She had developed curriculums for her classes and

the world languages department without criticism from the School District over her 25 years of employment, and she had received a number of awards.

Daniel Luke Keener began teaching at the high school in 2005. He taught Spanish "1" and "2" during the 2011-12 school year. He kept documentation focusing on comments made by students concerning Sulu and another Spanish teacher.

S.J. attended Scottsbluff Senior High School from August 2008 through December 2011 and took a number of Spanish classes, including two semesters of Spanish 2 from Keener and one semester of Spanish "4" from Sulu. S.J. thought Sulu's classes focused too much on culture and not enough on language. S.J. testified that she had "a couple of confrontations" with Sulu about being taught too much culture. When asked for more details about the confrontations, S.J. explained that students in Sulu's classroom told Sulu they felt they were not being taught Spanish and that S.J. "[j]ust joined in the conversation that we were taught more culture than . . . the language." In 2010, S.J. addressed her concerns about Sulu's classes with the principal at that time, but the principal did not provide any help.

## MEETING AND LETTER

In August 2011, Magana approached Keener and said that she was frustrated with the lack of rigor in upper-level Spanish classes. According to Keener, several students had similarly voiced opinions that the curriculum was not as rigorous as it should be. He arranged for Magana to meet with S.J., who was one of those students.

In August or September 2011, S.J. met briefly with Magana and Keener after school in Keener's classroom to express concerns about the Spanish curriculum. At that time, S.J. did not know Magana was a member of the Board. From Magana's standpoint, the meeting was for her to seek information as a member of the Board and its curriculum committee. Magana

suggested that writing a letter to the Board and the superintendent was an option for S.J.

In September 2011, S.J. drafted a letter to the Board to address her worries about the Spanish classes taught by Sulu. The letter spoke of concern about the foreign language programs—specifically the upper-level Spanish classes—not being at their "highest potential" and about culture being the main focus of study. The letter suggested that a "'surprise' observation day (including a standardized test)" would be beneficial. According to S.J., no one helped her with the content of the letter. S.J. asked Keener to proofread the letter, but she did not accept any of Keener's suggested changes. S.J. did not have anyone else review the letter. S.J. circulated the letter to classmates, asking them to sign it if they agreed, and 20 students signed it. S.J. mailed the letter to the superintendent of the School District and the Board. In response to a question later posed on social media as to whether the letter was Keener's or Magana's idea, S.J. answered, "both."

Sulu testified in a deposition that because Magana told S.J. to write the letter, Sulu assumed Magana told S.J. what to write in the letter. Sulu also testified that during mediation with Keener, he said Magana "had a hand in it" and helped write the letter. When asked, "[D]id he say she had a hand in it or he said she . . . helped write the letter?" Sulu answered, "Said . . . Magana and [S.J.] were together and then the letter was written."

## AFTERMATH OF LETTER

According to Sulu, her job changed as a result of the letter. Sulu testified that the superintendent told her to teach no culture, even though three of Nebraska's five teaching standards have to do with culture. She explained that due to the letter, the superintendent told her to change the curriculum in the middle of the year. Sulu believed that her employment could be terminated if she taught culture. She began taking her

students to a computer laboratory because she thought they were going to have to take a standardized test.

Sulu tendered her resignation to the Board in March 2012. She testified that she felt she had been pressured to quit. Sulu did not think that she had done anything wrong, but testified that "when [the superintendent] said, do you want to turn in your resignation right now, that was a signal to me." She testified that before the letter, she had the support of the administrators for 25 years.

## LAWSUIT

Sulu sued Magana. She alleged that Magana's actions were "committed not in her capacity as a [B]oard member nor on behalf of the [Board], but in her individual capacity as a private citizen." Sulu claimed that Magana actively participated with Keener in drafting the letter. She alleged that Magana's "initiation" of the letter was intentional, unjustified, and outside Magana's capacity as a Board member. Sulu further alleged that she had a valid business expectancy in her career as a Spanish teacher and that Magana's initiation of the letter interfered with Sulu's business relationship with the School District and caused harm to Sulu.

## SUMMARY JUDGMENT

Magana moved for summary judgment, and the district court granted the motion. The court found that Sulu presented no evidence to permit a reasonable inference that Magana's conduct was unjustified. The court explained:

There is no evidence [Magana] authored the letter in any fashion. There is no evidence the assertions of the letter are untruthful, even though some students may have regretted signing it. Though she expected the letter would be sent, there is no evidence Magana knew the contents of the letter before it was sent, or told the student what to put in the letter.

Sulu appealed, and we granted her petition to bypass the Nebraska Court of Appeals.

## ASSIGNMENT OF ERROR

Sulu assigns that the district court erred in finding that Magana's actions were "not unjustified" within the meaning of the elements of tortious interference with a business expectancy and, thus, erred in sustaining Magana's motion for summary judgment.

## STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is a question of law.[1]

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2]

## ANALYSIS

### Jurisdiction

[3] We must first address a jurisdictional question. Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[3]

The parties disagree whether the June 27, 2014, order granting summary judgment was final and appealable, thereby starting the running of the time for appeal. Sulu seeks to challenge the June 27 order via a notice of appeal filed on

---

[1] *In re Interest of Enyce J. & Eternity M.*, 291 Neb. 965, 870 N.W.2d 413 (2015).

[2] *Grammer v. Lucking*, 292 Neb. 475, 873 N.W.2d 387 (2016).

[3] *Castellar Partners v. AMP Limited*, 291 Neb. 163, 864 N.W.2d 391 (2015).

February 9, 2015. Magana argues that the appeal time began running when the summary judgment order was entered. Obviously, if this is correct, the appeal was out of time and we lack jurisdiction of the issue. Sulu responds that the order was not initially final but later became so.

The answer depends upon whether the absence of a ruling on a nonparty's motion for costs and fees—filed prior to entry of summary judgment—prevented the order granting summary judgment from being a final and appealable order. In order to set forth the pertinent procedural history, we provide the following timeline:

• December 22, 2013: School District files motion for costs and attorney fees under Neb. Ct. Disc. R. § 6-334(A) and Neb. Rev. Stat. § 84-712 (Reissue 2014). The motion does not include any notice of hearing.

• June 27, 2014: District court grants summary judgment in favor of Magana and states that "[m]otions for costs which are pending or which may be filed will be set for hearing on proper motion."

• July 7, 2014: Magana files motion to tax costs against Sulu and sets it for hearing on July 23.

• July 14, 2014: School District refiles motion for costs and fees.

• July 18, 2014: Sulu files notice of appeal.

• October 17, 2014: Pursuant to parties' stipulation, Court of Appeals dismisses appeal.

• January 23, 2015: District court grants Magana's motion for costs (although our transcript does not include this order, both parties' briefs recite that the motion was disposed of on that date).

• February 4, 2015: District court enters order granting School District's motion for costs.

• February 9, 2015: Sulu files notice of appeal, stating that she is appealing orders of June 27, 2014, and February 3, 2015.

[4,5] Our case law supports the conclusion that the School District's motion for costs prevented the summary judgment

order from becoming final until the motion was disposed of. Attorney fees, where recoverable, are generally treated as an element of court costs.[4] And an award of costs in a judgment is considered a part of the judgment.[5] Thus, in the context of a motion for attorney fees under Neb. Rev. Stat. § 25-824 (Reissue 2008), we have stated that when such a motion is made prior to the judgment of the court in which the attorney's services were rendered, the judgment will not become final and appealable until the court has ruled upon that motion.[6]

[6] The School District's motion for fees and expenses was authorized by a discovery rule. The rules governing discovery from a nonparty without a deposition authorize a sanction, including reasonable attorney fees, if undue burden or expense is imposed on the nonparty subject to a subpoena.[7] The rule also contemplates that the requesting party may be responsible for the advance payment of the reasonable cost of copying documents.[8] Thus, under Nebraska's discovery rules, the School District was permitted to seek an award of attorney fees and expenses.

The absence of any disposition of the nonparty's pending motion for costs and fees initially prevented the district court's judgment from being final. The School District moved for costs and attorney fees prior to the judgment. But the district court did not rule on the motion in the June 27, 2014, order; rather, the court stated that "[m]otions for costs which are pending or which may be filed will be set for hearing on proper motion." The court was likely signaling the parties that the School District's motion had not been noticed for

---

[4] *Murray v. Stine*, 291 Neb. 125, 864 N.W.2d 386 (2015).

[5] *Id.*

[6] See *id.*

[7] See § 6-334(A)(c)(1).

[8] See § 6-334(A)(c)(2)(A).

hearing. Nonetheless, the absence of any ruling on the motion left a portion of the judgment unresolved; consequently, the June 27 order was not final when it was first entered.

The summary judgment order became final on February 4, 2015, when the district court entered its order disposing of the School District's motion for costs and fees. Because Sulu timely appealed from the February 4 order, we have jurisdiction to consider the assignment of error directed to the June 27, 2014, order.

### Tortious Interference With Business Expectancy

[7-9] The principles regarding summary judgment are well established. A motion for summary judgment shall be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[9] When reasonable minds can differ as to whether an inference can be drawn, summary judgment should not be granted.[10] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[11]

[10] We have previously set forth what must be shown to prevail on a claim for tortious interference with a business relationship or expectancy. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the

---

[9] *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015).

[10] *Zornes v. Zornes*, 292 Neb. 271, 872 N.W.2d 571 (2015).

[11] *Id.*

interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[12] This appeal centers on one aspect of the third element of the claim—whether the act was "unjustified."

[11] To assist in determining whether interference is "unjustified," Nebraska has adopted the seven-factor balancing test of the Restatement (Second) of Torts.[13] Under the Restatement's general test, factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[14] Thus, we would ordinarily use these factors in order to determine whether interference is "improper" and, thus, "unjustified" under our law.[15]

But a different section of the Restatement sets forth a "special application of the general test."[16] Section 772 provides:

> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
> (a) truthful information, or

---

[12] *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015).

[13] See, *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009); Restatement (Second) of Torts § 767 (1979).

[14] See *Recio v. Evers, supra* note 13.

[15] See *Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461 (2000).

[16] See Restatement, *supra* note 13, § 772, comment *a.* at 50.

(b) honest advice within the scope of a request for the advice.[17]

[12] The truthfulness of the information provided correlates to whether the interference is unjustified. If the information provided is truthful, the interference is not unjustified.[18] Recently, in an appeal from entry of summary judgment against a plaintiff on her claim for tortious interference with a business relationship, we expressly held that "a person does not incur liability for interfering with a business relationship by giving truthful information to another."[19] Even though the third person to whom Magana gave the information and advice was S.J., and not Sulu's employer, we think the principle from § 772 still applies, particularly because Sulu alleged that Magana interfered by initiating the letter. Thus, if Magana gave truthful information and honest advice to S.J. in initiating the letter and was not aware that S.J. would include any false statements in it, its content would not be attributable to Magana.

[13] Magana produced evidence sufficient to show that she was entitled to judgment if the evidence were uncontroverted at trial. A party moving for summary judgment makes a prima facie case for summary judgment by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial.[20] Viewing the evidence in the light most favorable to Sulu, Magana initiated the letter by advising S.J. that S.J. could write a letter to the superintendent and the Board to express concerns about the Spanish curriculum. There was nothing false about this information. Nor was there any evidence providing an inference that Magana knew that S.J. would make any false statements

---

[17] *Id.*, § 772 at 50.

[18] See *Recio v. Evers, supra* note 13.

[19] *Id.* at 421, 771 N.W.2d at 133.

[20] *Roskop Dairy v. GEA Farm Tech., supra* note 9.

in the letter. Thus, Magana made a prima facie showing of entitlement to summary judgment by adducing evidence to show that her interference was not unjustified.

[14,15] The burden then shifted to Sulu. Once the moving party makes a prima facie case, the burden shifts to the party opposing the motion to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[21] Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork.[22]

Sulu failed to meet her burden to produce admissible contradictory evidence creating a material issue of fact to rebut Magana's prima facie case. Sulu attempts to connect Magana to the letter's authorship on three grounds.

[16] First, Sulu testified that she assumed Magana told S.J. what to write. Sulu's "assumption" does not establish that she had personal knowledge of the fact. Indeed, it confesses the absence of personal knowledge. In summary judgment proceedings, a witness' testimony may be used if it is based on personal knowledge, sets forth facts that would be admissible in evidence, and is made by a person competent to testify on the matter in issue.[23] Because Sulu lacked personal knowledge, her assumption cannot provide the necessary connection between Magana and the letter's allegedly false statements.

Sulu's second ground relies upon S.J.'s social media answer, but it did not speak to the authorship of the letter. The question

---

[21] *Id.*

[22] *Id.*

[23] See, Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 2008); *Chism v. Campbell*, 250 Neb. 921, 553 N.W.2d 741 (1996).

posed on social media was whether the letter was Keener's or Magana's idea. S.J. answered, "both." Reliance upon this question and answer for the identity of the letter's author amounts to mere guess, speculation, or conjecture, which is not sufficient to raise an issue of material fact.

[17,18] Sulu's final attempt rests upon her deposition testimony that Keener said Magana had a hand in helping S.J. write the letter. When pressed as to whether Keener told her that Magana "had a hand in it" or that Magana "helped write the letter," Sulu clarified that Keener told her that "Magana and [S.J.] were together and then the letter was written." But what Keener told Sulu would be hearsay.[24] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[25] And the general rule is that hearsay evidence is inadmissible unless it fits within a recognized exception to the rule against hearsay.[26] Thus, what Keener told Sulu cannot provide the link between Magana and the letter's false statements.

Magana adduced evidence that she had no input on the content of the letter and no involvement in its drafting, and Sulu failed to produce admissible evidence to the contrary. Because Magana did not write the letter or supply its content, whether the allegations contained therein were false is immaterial in this suit against her.

As we have already noted, Magana merely told S.J. that S.J. could write a letter to the superintendent and the Board to express concerns about the Spanish curriculum. This was clearly truthful information and honest advice. And because Magana provided only truthful information and honest advice, any interference on her part was not unjustified. We conclude

---

[24] See Neb. Evid. R. 801, Neb. Rev. Stat. § 27-801 (Reissue 2008).

[25] *Plowman v. Pratt*, 268 Neb. 466, 684 N.W.2d 28 (2004).

[26] *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012).

that the district court did not err in determining that there was no evidence which would permit a reasonable inference that Magana's conduct was unjustified. Thus, the court did not err in granting Magana's motion for summary judgment.

## CONCLUSION

The order granting summary judgment was not a final, appealable order due to a pending motion for costs and fees that the district court noted but did not immediately resolve. After that motion was ruled upon, Sulu timely filed her notice of appeal. We conclude that viewing the evidence in the light most favorable to Sulu, there was no evidence which would permit a reasonable inference that Magana's conduct was unjustified. Because the evidence showed that Magana provided S.J. with truthful information and honest advice and the evidence failed to raise any permissible inference to the contrary, any interference on Magana's part was not unjustified. We therefore affirm the entry of summary judgment.

AFFIRMED.