Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/04/2018 08:08 AM CDT

Kim M. Thompson, appellant, v.
Aaron M. Johnson and Shawna
L. Johnson, appellees.

___ N.W.2d ___

Filed May 4, 2018.    No. S-17-445.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Torts: Intent: Proof.** To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

4. **Torts: Employer and Employee.** Factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

5. **Torts: Liability.** A person does not incur liability for interfering with a business relationship by giving truthful information to another. Such interference is not improper, even if the facts are marshaled in such a

way that they speak for themselves and the person to whom the infor-
mation is given immediately recognizes them as a reason for breaking a
contract or refusing to deal with another.

6. **Summary Judgment: Proof.** Once the moving party makes a prima
facie case, the burden shifts to the party opposing the motion to produce
admissible contradictory evidence showing the existence of a material
issue of fact that prevents judgment as a matter of law.

7. **Appeal and Error.** An appellate court is not obligated to engage in an
analysis which is not needed to adjudicate the controversy before it.

Appeal from the District Court for Douglas County, Horatio
J. Wheelock, Judge, on appeal thereto from the County Court
for Douglas County, Susan M. Bazis, Judge. Judgment of
District Court affirmed.

Joy Shiffermiller and Abby Osborn, of Shiffermiller Law
Office, P.C., L.L.O., for appellant.

Damien J. Wright, of Welch Law Firm, P.C., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, and Stacy, JJ., and
Luther and O'Gorman, District Judges.

Luther, District Judge.

### INTRODUCTION

This appeal arises from a lawsuit filed by Kim M. Thompson
(Kim) in which she alleged that Aaron M. Johnson and Shawna
L. Johnson tortiously interfered with her business relationship
with her employer, Millard Public Schools (MPS). The county
court for Douglas County granted Aaron and Shawna's motion
for summary judgment, and the district court for Douglas
County affirmed. Kim now appeals to this court. Kim asserts,
in pertinent part, that the evidence shows a genuine issue of
material fact concerning whether interference by Aaron and
Shawna was justified. We conclude that the undisputed facts
show that Aaron's and Shawna's actions were justified, because
they provided truthful information to MPS. Therefore, we
affirm the district court's order.

## BACKGROUND

### Parties

The undisputed evidence shows that Kim and Aaron met through their work with MPS. In her position as a project manager employed by MPS, Kim organized construction projects within the district. Aaron worked on construction projects for MPS as an independent contractor. At all times relevant to this appeal, Aaron was married to Shawna and they had children attending MPS. In October 2011, Kim and Aaron began an extramarital affair.

### October 2012 Suspension

In October 2012, Shawna learned of the affair between Kim and Aaron. Aaron ended the affair and informed MPS that he would no longer work with Kim. Following an investigation, MPS discovered that Kim had used MPS' computers "to communicate inappropriate messages and pictures" with Aaron, in violation of MPS policy. As a result, MPS suspended Kim for 8 days without pay.

### Continued Contact and March 2014 Directives

Kim and Aaron continued to have contact with each other. On February 26, 2014, in response to an email from Kim in which she stated that Aaron did not care about her, Aaron wrote, "If I didn't care about you at all, why would I have ever agreed to talk to you? . . . If I didn't care and I wanted to go into your boss and get you fired, and ruin your life, I could have done it long ago."

Not long afterward, new concerns about Kim's job performance prompted a meeting between her and MPS officials. At the meeting on March 3, 2014, MPS officials addressed the issue of an angry and loud telephone call that Kim had conducted with her ex-husband in the workplace and allegations that Kim had gone through documents on her supervisor's desk.

During the meeting process, Kim volunteered that she was having issues with Aaron and Shawna. Kim stated to MPS officials that in November 2013, Aaron had shown up at her workplace demanding to speak to her and threatening to cause a scene. Kim told MPS officials that to process her feelings after "good talks" with Aaron in the summer of 2013, she had painted a painting of her and Aaron and posted it on Facebook, initially identifying the two by name. She stated that when Aaron asked her to remove the painting, she removed the identifying names, but she did not remove the painting. Kim reported that this caused Aaron to threaten to call her supervisor and jeopardize her employment. Kim also told MPS officials that Shawna had been stalking Kim's Facebook page.

On March 7, 2014, MPS wrote a letter to Kim documenting the topics discussed and the expectations communicated at the March 3 meeting. In part, the letter stated:

> **ISSUE #5:** The issue of your relationship with the person who almost cost you your job (Aaron) came up repeatedly . . . . This is related to the affair you had with Aaron (a former contractor for the District) in 2012 that was dealt with in your reprimand and suspension letter from late 2012.
>
> . . . .
> **EXPECTATION:** . . .
>
> . . . .
> We discussed how your affair with Aaron almost cost [you] your job before. Now, you appear to be escalating a confrontation with Aaron and his wife by posting on a public media page. . . . As we discussed, if you escalate this conflict and that escalation impacts [the] workplace, it is likely to lead to future discipline, up to and including termination.
>
> . . . .
> . . . Specifically, it is not our intention to take any action if Aaron or his wife reacts irrationally to a post that

is not about them. However, if your communications can be reasonably interpreted as an escalation of that conflict and that conflict disrupts the workplace, we may not be able to support you.

Kim signed the document, acknowledging that she had received it.

### Further Contact Between Parties, March to June 2014

On or about March 25, 2014, Shawna received a link from "Lisa Johnson," who claimed to be a friend of Kim's. The link invited Shawna to view a cloud account that contained over 200 documents showing communications between Kim and Aaron, to demonstrate to Shawna "what has been happening behind your back for the last year." "Lisa Johnson" claimed that she was able to access the information because Kim's password was easy to deduce. Shawna and "Lisa Johnson," who Shawna believed to be Kim, corresponded about the affair on Facebook, and Shawna used the format to tell Kim not to contact Aaron or Shawna again. On March 30, Aaron posted on the "Lisa Johnson" Facebook page, telling Kim to cease contact with him and his family.

On April 2, 2014, an attorney representing Aaron and Shawna sent a letter to Kim, telling her not to contact them. On April 9, an attorney for Kim sent a letter to Aaron and Shawna's attorney. The letter requested that Aaron not contact Kim at any location, including her workplace.

On April 14 and 23, 2014, Kim sent text messages to Aaron sarcastically praising Aaron's relationship with Shawna and expressing sadness over losing Aaron. On April 24, Shawna sent a long email message to Kim, telling her to stop contacting Aaron.

On April 28, 2014, Kim emailed Shawna an invitation to "Find me on Facebook." The email prompted Shawna to search Facebook, which led her to discover a Facebook page for "Kimberly Johnson." The "Kimberly Johnson" page consisted

of long, indepth journal-style posts related to Kim's affair with Aaron. This content was viewable to the public. Kim made similar posts on her "Kim Thompson" Facebook page. Kim continued to post on the Facebook pages with comments and questions specifically directed at Shawna.

On May 12, 2014, Shawna emailed Kim to arrange a meeting between Aaron, Shawna, and Kim to resolve the issues that had occurred. The meeting did not take place, but over the course of 5 days, Shawna and Kim exchanged a series of lengthy email messages, the tone of which ranged from vitriolic to sympathetic on both sides. Ultimately, Shawna asked for no further contact from Kim and shut down the email account that she had used to communicate with Kim.

Kim continued to post on her "Kimberly Thompson" Facebook page with comments directed at Aaron and Shawna. On May 31, 2014, Kim referenced Aaron and Shawna's children: "I burst out crying tonight just thinking about your boys [I] grew to love from just your stories. I am SO sad. I know it sounds crazy, but [I] feel like [I] lost them too."

On June 2, 2014, Kim reported to MPS that Shawna had posted on her Instagram account that Shawna had scheduled principal/parent meetings to discuss security concerns for her children due to an employee. Kim informed MPS that Aaron and Shawna had been "blocked" from her Facebook account.

On June 5, 2014, in a post directed at Shawna, Kim stated, "I do love your boys like my own, and I would never hurt them intentionally." Also on June 5, "Macy James" messaged the "Kimberly Thompson" Facebook account and stated, "I WILL follow through with the meetings scheduled this fall b/c you are unstable and should not have access to my kids in any way." Other elements of the message suggested that "Macy James" was likely Shawna.

On June 24, 2014, Kim sent a brief message to Aaron's work email account, calling him a "horrible person" and an "ugly man" with "no heart or a conscience." Aaron and Shawna

believed that this was the first time Kim had emailed that particular account. Shawna was concerned that Kim may have obtained the email address from MPS files for Aaron and Shawna's children, where the email address was listed as contact information. Further, Shawna was concerned, because, due to Kim's employment, Kim had access to MPS buildings; and Shawna thought it possible that Kim would attempt to involve her children in the situation or make contact with them to provoke a reaction from Aaron and Shawna.

### JULY 2014 TERMINATION

On July 2, 2014, Shawna emailed MPS to address the concerns that she and Aaron had for the safety and privacy of their children, whom Kim had not met. Shawna's email summarized the contact she and Aaron had with Kim beginning in 2012. Shawna further stated:

> Last week [Kim] emailed my husband's business email account . . . . The only way he or I can think she may have gotten this email account is through our children's confidential information held by the district . . . .
>
> . . . [W]e have sound reason to be concerned for the well[-]being of our children as [Kim] has access to all buildings in the district due to the nature of her job as I understand it. We are also very concerned that our privacy will inevitably be compromised so long as [Kim] works for MPS and our kids attend MPS. We are considering removing them from the district for this reason . . . .

Shawna requested a meeting on the matter, but she did not request any specific action relating to Kim. In an affidavit, Shawna specifically disclaimed sending the email with the intent of ending Kim's employment.

Shawna's email included a link to the "Kim Thompson" Facebook page and offered to provide additional documentation upon request. The same day, the director of human resources for MPS called Shawna and asked for additional

documentation. Shawna provided printouts of several Facebook postings, messages from Kim, and Shawna's own handwritten notes documenting her interactions with Kim.

During the resulting meeting with MPS on July 7, 2014, Kim admitted inviting Shawna to view her Facebook page and, except for some minor factual discrepancies, she admitted to posting the majority of the material provided by Shawna. MPS placed Kim on nondisciplinary, paid administrative leave while MPS investigated the matter. MPS officials told Kim not to have further contact with Aaron and Shawna until MPS decided how to proceed.

On July 8, 2014, the day after the meeting, Shawna received a notification from a social media website that Kim had "repinned [one] of [Shawna's] pins." MPS officials subsequently learned of this notification, which they considered contrary to the no-contact directive they had given to Kim.

MPS officials decided to terminate Kim's employment. At a deposition, MPS' director of employee relations explained that MPS officials based the decision on "insubordination, unprofessional conduct, just the continuation of the escalation of the conflict where she continued to post things that made it . . . uncomfortable with [Aaron and Shawna's] kids being in school as parents of the district, residents of the district, just inappropriate conduct." He also testified regarding why Thompson's employment was terminated in 2014 and not in 2012, when the affair first came to light:

> Q. Why wasn't [Kim] fired in 2012 when the affair was first discovered?
>
> A. . . . I recall the conversation being that she's had a fairly long tenure as a decent employee. Is there anything we can do to save her where she might change her behaviors? And at that point, it was thought there was a reasonable probability of success was the consensus if we allowed [Kim] to continue [her] job.
>
> Q. And in 2014, there was not the same feeling?
>
> A. Correct.

MPS officials offered Kim the option to resign in lieu of termination of her employment. Kim opted to resign.

## LITIGATION

On September 14, 2015, Kim filed a lawsuit against Aaron and Shawna in the county court. She alleged, inter alia, a cause of action based on the theory of tortious interference with a business relationship. In part, she averred that Aaron and Shawna had "committed numerous unjustified intentional acts of interference in an attempt to cause [Kim] to lose her job at [MPS]" and that such interference was done with the intent or reasonably foreseeable effect of causing harm to Kim.

Aaron and Shawna filed a motion for summary judgment. Following a hearing on the motion, consisting of the evidence above, the county court granted summary judgment in favor of Aaron and Shawna and dismissed Kim's complaint, with prejudice. In part, the county court found that Aaron and Shawna were justified in contacting MPS due to concerns for their children and that Shawna's email did not cause termination of Kim's employment. Instead, the county court determined that Kim's own conduct and continued contact with Aaron and Shawna caused the termination.

Kim appealed the county court's order to the district court. After a hearing, the district court affirmed.

Kim now appeals to this court.

## ASSIGNMENTS OF ERROR

Kim assigns, condensed and restated, that the county court erred in failing to find a genuine issue of material fact that precluded summary judgment against her claim of tortious interference with a business relationship.

## STANDARD OF REVIEW

[1,2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or

as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[2]

## ANALYSIS

Kim appeals the order of the district court that affirmed the county court's order granting summary judgment in favor of Aaron and Shawna. For the benefit of judges and practitioners, we take this opportunity to note that, effective August 24, 2017, the Legislature modified Neb. Rev. Stat. § 25-1332 (Supp. 2017) to impose citation and argument requirements regarding assertions of disputed facts on summary judgment. But here, neither party assigns error based upon the new procedures.

[3] This appeal turns on a single theory of recovery: tortious interference with a business relationship. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[3] On appeal, Kim disputes the county court's findings that no genuine issue of material fact existed concerning whether Aaron's and Shawna's interference was unjustified and whether such interference caused Kim to lose her job with MPS.

---

[1] *Benard v. McDowall, LLC*, 298 Neb. 398, 904 N.W.2d 679 (2017).

[2] *Id.*

[3] *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009).

### Whether Interference by Aaron
### and Shawna Was Unjustified

[4] To assist in determining whether interference is "unjustified" under the third prong of the foregoing test, Nebraska has adopted the seven-factor balancing test of the Restatement (Second) of Torts.[4] Under the Restatement's general test, factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[5]

[5] Ordinarily, we would use these factors to determine whether interference is "improper" and, thus, "unjustified" under our law.[6] However, if the information provided is truthful, the interference is not unjustified.[7] We have expressly stated, "[A] person does not incur liability for interfering with a business relationship by giving truthful information to another."[8] Such interference is not improper, even if the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking a contract or refusing to deal with another.[9] When truthful information provides the basis for a termination of a business relationship, the resulting liability, if any, should rest on the party who

---

[4] See, *Sulu v. Magana*, 293 Neb. 148, 879 N.W.2d 674 (2016), citing *Recio v. Evers, supra* note 3; Restatement (Second) of Torts § 767 (1979).

[5] *Id.*

[6] See *Sulu v. Magana, supra* note 4.

[7] *Sulu v. Magana, supra* note 4; *Recio v. Evers, supra* note 3.

[8] *Recio v. Evers, supra* note 3, 278 Neb. at 421, 771 N.W.2d at 133.

[9] *Id*.

made an informed choice to terminate the relationship—not the party who provided the facts upon which that decision was based.[10]

Viewed in the light most favorable to Kim, the evidence demonstrates that Aaron and Shawna conveyed truthful information to MPS and that, therefore, such communication was not unjustified. First, in 2012, Aaron informed MPS of his affair with Kim. The entire record and Kim's suit are based on the truthfulness of that disclosure. Second, Shawna's July 2, 2014, email to MPS officials raised Aaron's and Shawna's concerns for the safety and privacy of their children. Shawna provided specific examples of Kim's questionable behavior that were either supported or undisputed by the record. Her email also included a link to Kim's "Kim Thompson" Facebook page, and Shawna later provided additional documentary evidence of Kim's online activity to MPS. When MPS confronted Kim with the documentation provided by Shawna, Kim admitted to posting the material, except for a few minor factual disputes. But the discrepancies noted by Kim did not establish any genuine issue of material fact about the truthfulness of Shawna's disclosures to MPS.

Thus, because Aaron and Shawna deduced evidence that their communications with MPS were truthful and therefore not "unjustified," they disproved an essential element of tortious interference with a business relationship and made a prima facie showing that they were entitled to summary judgment.

[6] Once the moving party makes a prima facie case, the burden shifts to the party opposing the motion to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[11] Kim asserts that she presented evidence that Aaron's and Shawna's communications with MPS were not based in truth, thereby rebutting their position that those communications

---

[10] *Id.*

[11] *Sulu v. Magana, supra* note 4.

were justified. She primarily attempts to raise factual disputes about Aaron's and Shawna's beliefs relating to the source of Aaron's work email address and about their concerns regarding the children that Shawna said prompted her July 2014 email to MPS. We find no merit to Kim's arguments.

Kim contends that Shawna's email falsely claimed that prior to the message Kim sent to Aaron's work email address in June 2014, Kim had not used that particular address. Kim cites to the record and claims that she used Aaron's work email address in February 2014. However, the February 2014 email address cited by Kim is different from the one she used in June 2014; and the record does not reveal any other instance of Kim's sending messages to that address or receiving messages from it. Additionally, we note that Shawna's email did not categorically assert that Kim had accessed the children's records to obtain Aaron's work email address, but, rather, stated that the children's records were the only source for the information that Aaron and Shawna could surmise. The record simply does not raise any dispute as to the truthfulness of Aaron's and Shawna's professed beliefs about the source of the email address.

Kim further attempts to discredit Shawna's concern for her children's safety because Kim had never met the children and because Shawna was aware, through the copious documents disclosed to her, that Kim had expressed to Aaron that she cared about the children. Similarly, Kim argues that the evidence does not support concern for the children on Aaron's part, because he and Kim had previously corresponded about the children and Kim's potential relationship with them. However, the record does not contradict the sincerity of the concerns that Shawna attributed to herself and to Aaron. In fact, the undisputed evidence demonstrates that Aaron and Shawna had ample reason to be concerned. After the affair ended, Kim made varied, time-consuming, and at times underhanded efforts to engage Aaron and Shawna in intense discussions about the affair and about Aaron and Shawna as individuals.

These communications included references to Aaron and Shawna's children, to whom Kim had potential access through her employment. Certainly, Aaron's and Shawna's communications with Kim contributed to escalating tensions with her. But their participation does not negate the truthfulness of their reports to MPS concerning their interactions with Kim.

Kim also tries to refute the veracity of Aaron's and Shawna's concerns by citing their previous "threats" and actions to jeopardize Kim's employment. She specifically refers to Shawna's Instagram post, messages authored by "Macy James," the February 2014 email to Kim from Aaron, and Aaron's attempts to contact her at MPS. According to Kim, this evidence reflects the intent to have Kim's employment terminated. We note that Shawna expressly denied that she intended to end Kim's employment by emailing MPS. Furthermore, we have previously observed that while a malicious motive is a factor which may be considered in determining whether interference is unjustified, it is generally insufficient standing alone to establish that fact; and in making that observation, we reiterated that a party will not incur liability for the communication of truthful information.[12] While the evidence cited by Kim may imply an underlying desire that Kim's employment with MPS end and while the information Shawna provided was marshaled in a way that was damning to Kim, these factors do not diminish the truthfulness of Aaron's and Shawna's communications with MPS.

The factual disputes that Kim attempts to generate simply are not issues of material fact. Having considered Kim's arguments while giving her the benefit of all reasonable inferences deducible from the evidence, we discern no issue of material fact concerning the truthfulness of the information Aaron and Shawna provided to MPS.

In sum, Kim failed to meet her burden to produce admissible contradictory evidence creating a material issue of fact

---

[12] See *Recio v. Evers, supra* note 3.

to rebut Aaron and Shawna's prima facie case; and the district court did not err in affirming the county court's order granting summary judgment in favor of Aaron and Shawna.

### WHETHER INTERFERENCE BY AARON AND SHAWNA CAUSED HARM TO KIM

[7] Because we have concluded that Aaron and Shawna are not liable to Kim based on their truthful communications with MPS, thus defeating Kim's claim, we need not consider Kim's contentions that those communications caused her harm.[13] An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.[14]

### CONCLUSION

For the reasons stated above, we conclude that because Aaron and Shawna provided truthful information to MPS about Kim, they could not incur liability for interfering with Kim's business relationship with MPS. Therefore, the county court did not err in granting Aaron and Shawna's motion for summary judgment on Kim's claim of tortious interference with a business relationship, and the district court did not err when it affirmed the county court's ruling. Accordingly, we affirm the district court's order.

AFFIRMED.

FUNKE, J., participating on briefs.
WRIGHT, J., not participating.

---

[13] See *id.*

[14] *Id.*